**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**FILED**

February 10, 2016

Lyle W. Cayce
Clerk

No. 15-10154

HEALTH CARE SERVICE CORPORATION, an Illinois Mutual Legal Reserve Company,

Plaintiff - Appellee

v.

METHODIST HOSPITALS OF DALLAS, a Texas Corporation doing business as Methodist Health System,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before SMITH, WIENER, and GRAVES, Circuit Judges.

WIENER, Circuit Judge:

A Texas statute—Chapter 1301 of the Texas Insurance Code[1]—requires healthcare insurers to make coverage determinations and pay claims made by preferred healthcare providers within a specified time or face penalties. Plaintiff-Appellee Health Care Service Corporation ("HCSC") filed this action for a declaratory judgment against Defendant-Appellant Methodist Hospitals of Dallas ("Methodist"), seeking *inter alia* a declaration that (1) Chapter 1301 does not apply to HCSC as the administrator of particular health plans, and

---

[1] TEX. INS. CODE § 1301.

No. 15-10154

(2) the Federal Employee Health Benefits Act of 1959 ("FEHBA"), 5 U.S.C. § 8901, *et seq.*, preempts application of the statute to its administration of claims under the Federal Employees Health Benefits Program ("FEHBP"). The district court granted summary judgment in favor of  HCSC, holding that Chapter 1301 does not apply to HCSC as the administrator of the plans at issue and that FEHBA preempts Chapter 1301's application to claims under FEHBP plans administered by HCSC. We affirm.

## I.

## A.

Texas Insurance Code, Chapter 1301 applies exclusively to preferred provider plans.[2] It requires insurers receiving a "clean claim" to determine, within specified times, whether the claim is payable: 45 days for non-electronic claims and 30 days for electronic claims. Within these times, such insurers must either (1) pay the claim, (2) partially pay and partially deny the claim and notify the provider in writing of the reason for partial denial, or (3) deny the claim in full and notify the provider in writing of the reason for denial.[3] The Texas statute imposes a range of penalties for late payments of claims determined to be payable.[4]

The statute's express applicability provision—section 1301.0041—states that "this chapter applies to each preferred provider benefit plan in which an

---

[2] Together, Texas Insurance Code Chapters 843 (applicable to health maintenance organizations) and 1301 (applicable to preferred provider plans) comprise the Texas Prompt Pay Act. The instant case implicates only Chapter 1301.

[3] TEX. INS. CODE § 1301.103.

[4] *Id.* § 1301.137(a) (imposing penalties when "a clean claim submitted to an insurer is payable and the insurer does not determine . . . that the claim is payable and pay the claim on or before the date the insurer is required to make a determination or adjudication of the claim"). The statute does not provide any recourse for coverage determinations that occur after the 30- or 45-day deadlines but result in a determination that the claim is not payable. Accordingly, the statute imposes penalties only for late payment of approved claims.

2

No. 15-10154

insurer provides, through the insurer's health insurance policy, for the payment of a level of coverage that is different depending on whether an insured uses a preferred provider or a nonpreferred provider."[5] Separately, section 1301.109 extends the statute's coverage to administrators with whom insurers contract: "This subchapter applies to a person, including a pharmacy benefit manager, with whom an insurer contracts to: (1) process or pay claims; (2) obtain the services of physicians and health care providers to provide health care services to insureds; or (3) issue verifications or preauthorizations."[6]

The statute defines "preferred provider benefit plan" as "a benefit plan in which an insurer provides, through its health insurance policy, for the payment of a level of coverage that is different from the basic level of coverage provided by the health insurance policy if the insured person uses a preferred provider."[7] It defines "insurer" as "a life, health, and accident insurance company, health and accident insurance company, health insurance company, or other company operating under Chapter 841, 842, 884, 885, 982, or 1501, that is authorized to issue, deliver, or issue for delivery in this state health insurance policies."[8] The statute defines "health insurance policy" as "a group or individual insurance policy, certificate, or contract providing benefits for medical or surgical expenses incurred as a result of an accident or sickness."[9]

**B.**

HCSC is a mutual legal reserve company that operates in Texas as Blue Cross and Blue Shield of Texas ("BCBSTX"), a division of HCSC. Methodist is a healthcare provider that has a preferred provider agreement with HCSC,

---

[5] *Id.* § 1301.0041(a).
[6] *Id.* § 1301.109.
[7] *Id.* § 1301.001(9).
[8] *Id.* § 1301.001(5).
[9] *Id.* § 1301.001(2).

No. 15-10154

according to which Methodist agrees to provide medical services to patients who have health plans either insured or administered by HCSC.

BCBSTX acts in various roles, two of which are relevant in this case: (1) It administers some plans that expressly assume the risk of medical costs and establish their own benefit plans, and (2) it services benefit plans for federal employees in Texas, pursuant to the FEHBP, under the Blue Cross and Blue Shield Service Benefit Plan, known as the Federal Employee Program. (BCBSTX also operates as a direct insurer, selling fully insured plans and assuming the risk of medical costs. None of the claims at issue here, however, implicate the fully insured plans offered by BCBSTX.)

In the first category, BCBSTX acts as the administrator for (1) employer self-funded plans, (2) state government plans, and (3) claims arising under the BlueCard program. When BCBSTX administers self-funded plans and state government plans, it enters into administrator agreements with such plans to perform administrative services only. Those services include processing claims, providing customer service, linking beneficiaries to providers, and making medical-necessity determinations. The plans, not BCBSTX, must bear the risk of medical costs.[10]

As for BlueCard claims administered by BCBSTX, the BlueCard program allows beneficiaries covered by out-of-state Blue Cross and Blue Shield plans to access their coverage when receiving medical services in a state

---

[10] "Under a self-funded benefit plan, an employer assumes the risk of providing health insurance to its employees, instead of ceding the risk to a third-party insurance company. The employer then either sets aside funds for its employees' covered medical expenses or pays for such expenses out of its general accounts." *Tex. Dep't of Ins. v. Am. Nat'l Ins. Co.*, 410 S.W.3d 843, 846 (Tex. 2012). *See also id.* at 848 ("Employers who self fund their employee health-benefit plans are clearly not insurance companies, but they perform a similar service.").

other than the one in which their plans are based. If, for example, an out-of-state Blue Cross beneficiary receives medical care in Texas, the medical provider submits a claim to BCBSTX, which forwards the claim to the beneficiary's out-of-state Blue Cross plan. That out-of-state Blue Cross plan makes a coverage determination, then returns the claim to BCBSTX to pay the claim if there is coverage. Finally, the out-of-state plan reimburses BCBSTX for any payments made on its behalf.

In the second category, BCBSTX's only obligation is to service FEHBP plans. FEHBA provides health benefits for federal employees.[11] Under FEHBA, the federal Office of Personnel Management ("OPM") negotiates plans with various insurers. Relevant here, the OPM[12] and the Blue Cross and Blue Shield Association contracted to form the Federal Employee Program to provide health benefits plans for federal employees. Local affiliates of Blue Cross administer the plans within such affiliates' states. In Texas, BCBSTX, as a licensee of the Blue Cross and Blue Shield Association, processes claims and provides customer service for members of the Federal Employee Program. Under this scheme, the federal government pays about 75% of the premiums and the enrollees pay the remainder.[13] These premiums are paid into the U.S.

---

[11] *See* 5 U.S.C. §§ 8901-8914.

[12] FEHBA gives the OPM the responsibility to negotiate and regulate federal employees' health benefit plans. *See id.* § 8902(a).

[13] *Id.* § 8906(b); *see also Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 684 (2006).

No. 15-10154

Treasury Employees Health Benefits Fund.[14] BCBSTX draws from this fund to pay for both covered benefits and administrative costs.[15]

## C.

Anticipating that Methodist would seek relief under Chapter 1301 for the late payments of its claims, HCSC filed this action for, relevantly, a declaration that (1) Chapter 1301 of the Texas Insurance Code does not apply to HCSC's administration of self-funded plans, state government plans, or claims under the BlueCard program, (2) the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, preempts Chapter 1301's application to claims arising under self-funded ERISA plans, and (3) FEHBA preempts Chapter 1301's application to claims arising from FEHBP plans. Methodist asserted a counterclaim for over $31 million in penalties, interest, and attorneys fees under Chapter 1301 attributable to BCBSTX's alleged late payment of approved claims.

HCSC moved for summary judgment on all claims and counterclaims. In granting HCSC's motion, the district court held that (1) Chapter 1301 does not apply to BCBSTX's administration of the plans at issue, and (2) FEHBA preempts application of Chapter 1301 to Methodist's claims arising from FEHBA-governed plans. Because it found that Chapter 1301 does not apply to BCBSTX's administration of the self-funded plans, the district court did not address whether ERISA preempts such application. Methodist filed a motion for reconsideration, which the district court denied.

---

[14] 5 U.S.C. § 8909(a) ("There is in the Treasury of the United States an Employees Health Benefits Fund which is administered by the Office of Personnel Management. The contributions of enrollees and the Government described by section 8906 of this title shall be paid into the Fund.").

[15] *Id.* ("The Fund is available—(1) . . . for all payments to approved health benefits plans; and (2) to pay expenses for administering this chapter . . . .").

No. 15-10154

## II.

## A.

We review a district court's summary judgment de novo.[16] We review the facts in the light most favorable to the non-moving party.[17] Summary judgment is appropriate only when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.[18]

## B.

We first consider whether Chapter 1301 applies to BCBSTX's administration of the plans at issue. HCSC contends that Chapter 1301 does not apply to BCBSTX's administration of self-funded plans, state government plans, or claims under the BlueCard program because (1) BCBSTX is not an "insurer" providing coverage through its "health insurance policy" under Chapter 1301's general applicability section, and (2) BCBSTX is not a "person" with whom an "insurer" is contracting to perform administrative services under section 1301.109.

Methodist counters that Chapter 1301's definition of "insurer" is broad enough to encompass BCBSTX's activities, even when it acts only as an administrator. Methodist further asserts that, individually or collectively, BCBSTX's administrator agreements and preferred-provider agreements constitute "health insurance policies" under Chapter 1301.

We are convinced that BCBSTX neither provides for coverage through its "health insurance policy" when it administers the plans at issue here, nor is a "person" with whom an "insurer" contracts to perform administrative

---

[16] *Martinez v. Tex. Workforce Comm'n—Civil Rights Div.*, 775 F.3d 685, 687 (5th Cir. 2014).

[17] *Id.*

[18] *Id.* (quoting FED. R. CIV. P. 56(a)).

No. 15-10154

services. We therefore hold that Chapter 1301 is not applicable to BCBSTX's activities as administrator of the self-funded plans or state government plans, nor to those activities that it performs as administrator of claims under the BlueCard program.

## 1.

Texas law governs this issue. We review determinations of state law de novo.[19] When interpreting a Texas statute, we follow "the same rules of construction that a Texas court would apply—and under Texas law the starting point of our analysis is the plain language of the statute."[20] Texas courts aim "to determine and give effect to the Legislature's intent" when construing a statute.[21] When a statute is clear and unambiguous, Texas courts "apply its words according to their common meaning in a way that gives effect to every word, clause, and sentence."[22] If a "statute's words are unambiguous and yield a single inescapable interpretation, the judge's inquiry is at an end."[23] When a statute defines a term, the "court is bound to construe that term by its statutory definition only."[24] Further, the court should consider a provision in the context of the broader statute because "[o]nly in the context of the remainder of the statute can the true meaning of a single provision be made clear."[25]

---

[19] *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 239 (1991) ("The obligation of responsible appellate review and the principles of a cooperative judicial federalism underlying *Erie* require that courts of appeals review the state-law determinations of district courts *de novo*.").

[20] *Wright v. Ford Motor Co.*, 508 F.3d 263, 269 (5th Cir. 2007).

[21] *Am. Nat'l Ins. Co.*, 410 S.W.3d at 853.

[22] *Id.* (quotation marks and citation omitted).

[23] *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651–52 (Tex. 2006).

[24] *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002).

[25] *Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132, 133 (Tex. 1994).

No. 15-10154

**2.**

We first determine whether Chapter 1301's express applicability provision makes that statute applicable to BCBSTX's relevant roles in this case. Chapter 1301 applies expressly "to each preferred provider benefit plan in which an insurer provides, through the insurer's health insurance policy, for the payment of a level of coverage . . . ."[26] Thus, we must determine whether BCBSTX, acting in its capacity as an administrator, is an "insurer" and whether it provides coverage through its "health insurance policy."

Chapter 1301 defines "insurer" as "a life, health, and accident insurance company, health and accident insurance company, health insurance company, or other company operating under Chapter 841, 842, 884, 885, 982, or 1501, that is authorized to issue, deliver, or issue for delivery in this state health insurance policies."[27] The parties agree that BCBSTX operates generally as a licensed insurance carrier under Chapter 841 and that it is authorized to issue health insurance policies in Texas. Thus, BCBSTX would seem to fit Chapter 1301's definition of "insurer." BCBSTX insists, however, that it is not an "insurer" under Chapter 1301 when, as here, it acts only as an administrator. Instead, notes BCBSTX, it operates under a different chapter—Chapter 4151 of the Texas Insurance Code—when only administering plans. It observes that Chapter 4151 is not one of the chapters enumerated in Chapter 1301's definition of insurer. Resolving the parties' opposing contentions is not necessary, however, because we conclude that Chapter 1301 is inapplicable for a different reason.

---

[26] TEX. INS. CODE § 1301.0041(a).
[27] *Id.* § 1301.001(5).

9

No. 15-10154

Even if BCBSTX is an "insurer" under Chapter 1301, it does not provide payments through its "health insurance policy" when it is administering the plans here at issue. Methodist insists that subsection 1301.0041(a)'s "provides . . . for . . . payment" language is broad enough to encompass the actions of an administrator that merely facilitates payment and does not have the financial burden of payment. Under this reasoning, Methodist relies on the common definition of "provide" because the statute does not define this term. Methodist contends further that BCBSTX maintains a "health insurance policy" under Chapter 1301. It urges us to hold that, individually or collectively, BCBSTX's administrator agreements and preferred provider network agreements constitute a "health insurance policy."[28]

First, Methodist reads Chapter 1301's "provides . . . for . . . payment" language too broadly. When referring to payments made by administrators, Chapter 1301 does not use these quoted words, but instead describes those acts of administrators with the words, "process or pay claims."[29] This suggests that subsection 1301.0041(a)'s "provides . . . for . . . payment" language does not encompass payments by others that are merely distributed by an administrator.

But even accepting, arguendo, Methodist's insistence that subsection 1301.0041(a)'s "provides . . . for . . . payment" language is broad enough to encompass an administrator's payment of claims on behalf of a self-funded plan, Methodist's reasoning still fails: BCBSTX does not make payments

---

[28] In support of its argument to read the two agreements as a single contract, Methodist relies on a federal district court decision in which the court relied on a "single unified contract theory" to conclude that a claims administrator was in privity of contract with a healthcare provider. *See Baylor Univ. Med. Ctr. v. Epoch Group, L.C.*, 340 F. Supp. 2d 749 (N.D. Tex. 2004).

[29] *See* TEX. INS. CODE § 1301.109.

10

through its "health insurance policy" as defined by Chapter 1301. Under that chapter, a "health insurance policy" means "a group or individual insurance policy, certificate, or contract providing benefits for medical or surgical expenses incurred as a result of an accident or sickness."[30] Importantly, a health insurance policy must *provide benefits* for medical or surgical expenses. Here, as the parties agree, BCBSTX's preferred provider agreements set out, *inter alia*, the reimbursement rate for services rendered by providers to beneficiaries, and the administrator agreements establish BCBSTX's duties as administrator, consisting of, for example, making coverage determinations and paying claims. Whether read together or separately, the provider and administrator agreements provide no benefits for medical or surgical expenses. Instead, any benefits furnished to beneficiaries derive from the plans of others, wholly independent of any contractual relationship with BCBSTX. Simply put, BCBSTX, as an administrator, does not confer any benefits for medical expenses on beneficiaries and therefore does not provide for payment through its "health insurance policy."[31]

Our conclusion that BCBSTX does not provide benefits through its administrator and preferred provider agreements, but instead merely distributes claim payments from plans to providers, is consistent with the text of Chapter 1301. That text clearly distinguishes between the provision of "benefits" to beneficiaries and the payment of "claims" to providers, by using the word "benefit" in relation to insureds, not providers. For example,

---

[30] *Id.* § 1301.001(2).

[31] Methodist also contends that in subsection 1301.001(2)'s definition of "insurer," the word "insurance" modifies only "policy," and that therefore any "certificate" or "contract" can also be a "health insurance policy" under Chapter 1301. Even if this reasoning is correct, this argument ignores that definition's operative words: "providing benefits for medical or surgical expenses."

subsection 1301.001(1) refers to "benefits to an insured." Likewise, section 1301.005 requires that "preferred provider benefits and basic level benefits are reasonably available to all insureds . . . ." In contrast, when describing payments of claims to providers, Chapter 1301 uses the term "payment of claims," not "payment of benefits."[32]

Methodist also argues that BCBSTX provides coverage through its "health insurance policy" because it acts as a stop-loss insurer for some of the plans it administers and therefore acts as a direct insurer. In *Brown v. Granatelli*,[33] we cautioned in dicta that a stop-loss insurance policy could qualify as an accident-and-sickness policy subject to regulation as direct insurance if its coverage kicked in at an unreasonably low dollar amount.[34] Here, HCSC provides stop-loss insurance for some of the self-funded plans from which Methodist's claims for penalties arise. Methodist now speculates that *if* HCSC's stop-loss insurance is triggered at unreasonably low amounts, it should be considered an "insurer" under Chapter 1301.

Methodist's argument fails on the facts. Methodist points to no evidence in the record suggesting that HCSC's stop-loss insurance triggers at unreasonably low amounts.

---

[32] *See, e.g.*, TEX. INS. CODE § 1301.139 (using the language "payment of claims to preferred providers"); *id.* § 1301.109 (using the language "pay claims"); *id.* § 1301.103 (referring to "whether the claim is payable"); *id.* § 1301.137(a) (using "claim is payable" and "pay the claim" language to describe payments to providers).

[33] 897 F.2d 1351 (5th Cir. 1990).

[34] *Id.* at 1355 ("We do not suggest that Article 3.70-2(E) can be avoided by naming an employee benefit plan as the insured on a policy which in reality insures the plan participants. If, for example, a plan paid only the first $500 of a beneficiaries' health claim, leaving all else to the insurer, labeling its coverage stop-loss or catastrophic coverage would not mask the reality that it is close to a simple purchase of group accident and sickness coverage.").

No. 15-10154

We conclude that BCBSTX does not provide for payment through its health insurance policy when it only administers the plans at issue. We therefore hold that subsection 1301.0041(a) is inapplicable.

**3.**

Having determined that Chapter 1301's express applicability section does not apply to BCBSTX when it administers self-funded plans or state government plans, or when it processes claims under the BlueCard program, we next examine whether Chapter 1301 applies to BCBSTX by virtue of section 1301.109. That section extends Chapter 1301 "to a person . . . with whom an *insurer* contracts to" perform certain administrative services.[35] Thus, for section 1301.109 to apply, the self-funded plans, state government plans, and out-of-state BlueCard plans must operate as "insurers" under Chapter 1301.

The self-funded plans and state government plans are not insurers under subsection 1301.001(5) because they do not operate under any of that subsection's enumerated provisions. Neither are they authorized to issue, deliver, or issue for delivery health insurance policies in Texas.[36] Accordingly, BCBSTX is not an entity with which an "insurer" contracts in relation to these plans, and section 1301.109 is therefore inapplicable. This reasoning applies with equal force when BCBSTX administers claims under the BlueCard program for out-of-state Blue Cross plans administered or insured by out-of-state insurers.

---

[35] TEX. INS. CODE § 1301.109 (emphasis added) (extending Chapter 1301 "to a person . . . with whom an insurer contracts to: (1) process or pay claims; (2) obtain the services of physicians and health care providers to provide health care services to insureds; or (3) issue verifications or preauthorizations").

[36] *Id.* § 1301.001(5); *see also Am. Nat'l Ins. Co.*, 410 S.W.3d at 849 ("[S]elf-funded employee health-benefit plans . . . are not regulated like insurance companies."); *id.* at 849 n.5 (noting that Texas law exempts self-funded plans of governmental entities from regulation).

No. 15-10154

In its reply brief, Methodist contends—for the first time—that section 1301.109 applies to BCBSTX's administration of an indeterminate subset of BlueCard claims in which an out-of-state division of HCSC—as opposed to a separate independent licensee of the Blue Cross and Blue Shield Association—administers or insures the out-of-state plan.[37] Under this reasoning, Methodist contends that section 1301.109 applies to such claims because the out-of-state plan is issued by an "insurer" under Chapter 1301, given that HCSC is a licensed Texas insurer through its BCBSTX division.

We note initially that Methodist points to no evidence in the record demonstrating that any of its claims for late payment arise from claims that BCBSTX administered on behalf of out-of-state plans insured by one of HCSC's other operating divisions. At this late stage, Methodist points only to the fact that HCSC administers and insures Blue Cross plans in Illinois, Montana, New Mexico, and Oklahoma.

More problematic is the fact that Methodist's initial appellate brief challenges only the district court's determination that Chapter 1301 does not apply to BCBSTX's administration of self-funded plans. It raises no challenge to the district court's holding that Chapter 1301 does not apply to BCBSTX's processing of claims under the BlueCard program. This alone constitutes a waiver of the right to have us review this issue.[38] Furthermore, Methodist never advanced this argument or presented evidence on this issue before the district court, either in its motion for summary judgment or its motion for

---

[37] Because HCSC operates in only five states—Texas, Illinois, Montana, New Mexico, and Oklahoma—Methodist's new theory would implicate only BlueCard claims processed by BCBSTX on behalf of one of HCSC's divisions in those states.

[38] *See DSC Commc'ns Corp. v. Next Level Commc'ns*, 107 F.3d 322, 327 n.2 (5th Cir. 1997) ("[I]t is clear that a party who fails to raise an issue in its initial brief waives the right to review of that issue . . . .").

14

reconsideration.[39] In fact, Methodist never even invoked section 1301.109 as a basis for applying Chapter 1301 to BCBSTX or attempted to draw any distinction between out-of-state Blue Cross plans operated by independent licensees and those operated by divisions of HCSC. Raising this new theory now, Methodist attempts to take a prohibited additional bite of the apple. It suffices that, because it failed to raise this argument until filing its appellate reply brief, Methodist has waived it.

**4.**

Finally, we observe that Methodist's construction of Chapter 1301 is incredibly strained in light of the overall structure of the statute. Chapter 1301's express applicability section—section 1301.0041—applies generally to "insurers," and another section—section 1301.109—extends Chapter 1301 to administrators with whom "insurers" contract. Methodist does not urge that Chapter 1301 applies directly to the plans at issue; neither does it urge that Chapter 1301 applies to administrators of self-funded plans under Chapter 1301's provision that extends the statute to administrators. Instead, Methodist claims that Chapter 1301 applies to administrators of the plans only when those administrators also happen to operate as insurers. Under Methodist's proffered construction, Chapter 1301 (1) would apply to administrators that are *not* otherwise insurers of insured plans under section 1301.109, (2) would apply to administrators that are otherwise insurers of self-funded plans under

---

[39] *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); *Celanese Corp. v. Martin K. Eby Const. Co.*, 620 F.3d 529, 531 (5th Cir. 2010) ("The general rule of this court is that arguments not raised before the district court are waived and will not be considered on appeal."); *Local Union No. 59 v. Namco Elec., Inc.*, 653 F.2d 143, 146 (5th Cir. 1981) ("We are constrained to review only those exhibits, depositions, and affidavits that were presented to, and considered by, the trial court. The court of appeals is not the proper forum in which to present new facts or proffer new evidence.").

No. 15-10154

section 1301.0041(a), and (3) would *not* apply to administrators that are not otherwise insurers of self-funded plans.

This result makes no sense. First, Methodist leaves unexplained why the legislature would choose to expressly extend Chapter 1301 to administrators of insured plans under section 1301.109, but not extend it to administrators of self-funded plans in the same way. Section 1301.109 could, for example, apply to "a person . . . with whom an insurer [or self-funded plan] contracts." Second, Methodist also leaves unexplained why the legislature would extend Chapter 1301 to administrators of insured plans, regardless of whether the administrator otherwise operates as an insurer, but choose to extend Chapter 1301 to administrators of self-funded plans only when such administrators otherwise operate as insurers.

Based on our plain reading of the statute, we affirm the district court's ruling that Chapter 1301 is inapplicable to BCBSTX when it administers self-funded plans, state government plans, and claims under the BlueCard program.[40]

## C.

We turn finally to the separate question whether FEHBA preempts Chapter 1301's application to claims arising under FEHBP plans processed by BCBSTX.

FEHBA contains an express preemption provision:

---

[40] The parties also point to the legislative history of Chapter 1301 and the Texas Department of Insurance's interpretation of Chapter 1301. Finding that the statute is unambiguous, we do not rely on these interpretative aids. *See City of Round Rock v. Rodriguez*, 399 S.W.3d 130, 137 (Tex. 2013) ("When a statute is clear and unambiguous, we do not resort to extrinsic aides such as legislative history to interpret the statute."). For the same reason, we decline Methodist's invitation to certify this issue to the Texas Supreme Court.

No. 15-10154

> The terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits (including payment with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans.[41]

"The policy underlying § 8902(m)(1) is to ensure nationwide uniformity of the administration of FEHBA benefits."[42] But, "Section 8902(m)(1)'s text does not purport to render inoperative *any and all* state laws that in some way bear on federal employee-benefit plans."[43] As articulated by the Second Circuit, preemption occurs under FEHBA when (1) "the FEHBA contract terms at issue 'relate to the nature, provision, or extent of coverage or benefits,'" and (2) the state law relates to health insurance or plans.[44] The parties dispute only whether the second prong of this test is met.

Holding that FEHBA preempts Methodist's Chapter 1301 claims arising out of FEHBP plans, the district court determined that Chapter 1301 relates to the plans because Methodist asserts its rights to statutory penalties under Chapter 1301, application of which depends on the way that such claims are processed under the Federal Employee Program. The district court relied on the declaration of an HCSC employee who indicated that when a provider submits a claim, the Federal Employee Program Direct System makes a coverage determination, which is then communicated to BCBSTX. Only then does BCBSTX process the claim in accordance with that determination.[45] On

---

[41] 5 U.S.C. § 8902(m)(1).

[42] *Burkey v. Gov't Emps. Hosp. Ass'n*, 983 F.2d 656, 660 (5th Cir. 1993).

[43] *McVeigh*, 547 U.S. at 698.

[44] *Empire HealthChoice Assur., Inc. v. McVeigh*, 396 F.3d 136, 145 (2d Cir. 2005), *aff'd*, 547 U.S. 677 (2006) (quoting 5 U.S.C. § 8902(m)(1)).

[45] The affidavit also provides that the Federal Employee Program is subject to "claims timeliness requirements," including the OPM's requirement that 95% of claims be paid within 30 days.

this basis, the district court concluded that Methodist's demand for penalties under Chapter 1301 for claims paid through this mechanism relates to and depends on the provisions of the FEHBP plan.

In *Burkey v. Government Employees Hospital Ass'n*, we addressed a similar issue. There, a beneficiary asserted a Louisiana state-law claim for unreasonable delay in paying health and accident insurance claims against an authorized insurance carrier under FEHBA. We rejected the beneficiary's argument that the claim was not preempted because it related only to remedies and not to the nature or extent of coverage of benefits: "No such distinction can sensibly be made. Tort claims arising out of the manner in which a benefit claim is handled are not separable from the terms of the contract that governs benefits."[46] In sum, "[i]nsofar as the . . . claim for statutory delay damages necessarily refers to [the] plan to determine coverage and whether the proper claims handling process was followed, it refers to the plan, 'relates to' it and is therefore preempted."[47] We also noted that preemption was *required* because "imposition of Louisiana statutory penalties would invariably expand [the carrier's] obligations under the terms of its plan and would foster interstate conflicts in coverage."[48]

Attempting to distinguish *Burkey*, Methodist argues that Chapter 1301 does not "relate to" FEHBP plans because it permits a claim for statutory penalties only after an affirmative coverage decision and therefore requires no inquiry into any substantive coverage determination.[49] But this reasoning

---

[46] *Burkey*, 983 F.2d at 660.

[47] *Id.*

[48] *Id.*

[49] Methodist also relies on a number of cases in which courts conducted complete preemption analyses under FEHBA. Because complete preemption relates to federal jurisdiction and requires an inquiry different from that present here, Methodist's reliance on

ignores the effect of Chapter 1301: By imposing penalties for late payments of approved claims, Chapter 1301 also imposes claims-processing deadlines on FEHBP carriers.[50] As in *Burkey*, imposition of Chapter 1301's penalties would expand FEHBP carriers' duties under the plans and force them to comply with divergent state deadlines for claims processing and payment. Further, any inquiry under Chapter 1301 requires an inquiry into how an FEHBP carrier administers a plan under its contract with the OPM.

Although Methodist fails to acknowledge the effect of Chapter 1301, its impact on FEHBP carriers is clear. As noted above, section 1301.103 requires insurers receiving a "clean claim" first to "*make a determination of whether the claim is payable*" within 45 days for nonelectronic claims and 30 days for electronic claims, then either (1) pay the claim, (2) partially pay and partially deny the claim and notify the provider in writing of the reason for partial denial, or (3) deny the claim and notify the provider in writing of the reason for denial.[51] By imposing penalties for late payments, Chapter 1301 mandates that insurers process and pay claims within the set time periods.[52]

---

these cases is unavailing. *See Pellicano v. Blue Cross Blue Shield Ass'n*, 540 F. App'x 95, 99 (3d Cir. 2013) (disregarding a party's reliance on cases concerning "§ 8902(m)(1)'s effect on federal jurisdiction, not whether FEHBA preemption provides a substantive defense to a particular state law claim that is properly brought in federal court").

[50] *See America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1331 (11th Cir. 2014) (rejecting the argument that Georgia's prompt pay statute is not preempted by ERISA because it does not impact substantive coverage determinations because although the "requirements will not necessarily directly alter the coverage decision-making process, . . . they *will* compel certain action (prompt benefit determinations and payments) by plans and their administrators" (emphasis in original)).

[51] TEX. INS. CODE § 1301.103 (emphasis added).

[52] *See America's Health Ins. Plans v. Hudgens*, 915 F. Supp. 2d 1340, 1359 (N.D. Ga. 2012), *aff'd*, 742 F.3d 1319 (11th Cir. 2014) ("The Prompt Pay Statute . . . requires health plans, including ERISA plans, to process and to pay provider claims, or to send notices denying the claims, within 15 or 30 days, depending on whether the claim is submitted electronically or in paper. Although not explicit, the statute necessarily requires that benefit eligibility determinations (i.e., determinations as to whether the claim is covered) also be

No. 15-10154

Consequently, Chapter 1301 would directly affect the operation of the plans and expand FEHBP carriers' duties under the plans. On this basis, Chapter 1301 does relate to FEHBP plans.[53]

Our holding comports with the purpose of FEHBA. As stated in *Burkey*, "[t]he policy underlying § 8902(m)(1) is to ensure nationwide uniformity of the administration of FEHBA benefits."[54] Allowing states to regulate the timing of claims administration by FEHBP administrators clearly conflicts with this purpose. Importantly, Chapter 1301 does not present a case when the effect on plans is too remote or tenuous to "relate to" the plans. Although the direct result of Chapter 1301 is an increased cost to carriers, this does not provide the basis for our decision. Rather, preemption is supported by the recognition that the penalties compel coverage determinations and payments within state-imposed time periods, thereby affecting the administration of the plans and altering FEHBP carriers' obligations under their contracts with the OPM.[55] In as much as application of Chapter 1301 to FEHBP carriers would disrupt the uniformity of FEHBP plan administration, we hold that FEHBA preempts Chapter 1301's application to the claims processed by BCBSTX under FEHBP plans.

---

made within 15 or 30 days, in time to satisfy the payment or notice timing requirement. These requirements, when applied to ERISA plans, have at least a 'connection' with the plans.").

[53] Performing a similar inquiry, the Eleventh Circuit recently held that ERISA preempts application of Georgia's prompt-pay statute to self-funded plans. *See Hudgens*, 742 F.3d at 1331 (holding that ERISA preempts application of Georgia's prompt pay statute to self-funded employer plans because "employers offering self-funded health benefit plans would be faced with different timeliness obligations in different states, thereby frustrating Congress's intent").

[54] *Burkey*, 983 F.2d at 660.

[55] As stated, the OPM requires 95% of claims to be paid within 30 working days.

No. 15-10154

## III.

We affirm the district court's judgment declaring that Chapter 1301 does not apply to BCBSTX's administration of the plans at issue here and that FEHBA preempts application of Chapter 1301 to claims administered by BCBSTX under the FEHBP.

AFFIRMED.